UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JONATHAN GLAUBACH<br>525 Woodmere Blvd.<br>Woodmere, NY 11598,<br>Individually and on Behalf of All Others<br>Similarly Situated, | ) ) ) ) ) | Civil No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CARLYLE CAPITAL CORPORATION<br>LIMITED<br>c/o Begbies Traynor<br>Charles House<br>Charles Street<br>St. Helier<br>Jersey<br>Channel Islands JE2 4SF, | ) ) ) ) ) ) ) ) | |
| | ) | |
| CARLYLE INVESTMENT MANAGEMENT,<br>LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004, | ) ) ) ) | |
| | ) | |
| T.C. GROUP, LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004, | ) ) ) | |
| | ) | |
| TCG HOLDINGS, LLC<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004, | ) ) ) ) | |
| | ) | |
| _____ ) | | DEMAND FOR JURY TRIAL |
| [Caption continued on following page.] | | |

CLASS ACTION COMPLAINT

WILLIAM ELIAS CONWAY, JR.          )
6501 Menlo Road                    )
McLean, VA 22101,                  )
                                   )
JOHN CRUMPTON STOMBER              )
120 Carter Street                  )
New Canaan, CT 06840,              )
                                   )
JAMES H. HANCE                     )
424 Eastover Road                  )
Charlotte, NC 28207,               )
                                   )
MICHAEL J. ZUPON                   )
4 Lindsley Drive                   )
Larchmont, NY 10538,               )
                                   )
ROBERT BARCLAY ALLARDICE, III      )
127 Bay Street                     )
Sag Harbor, NY 11963,              )
                                   )
HARVEY JAY SARLES                  )
60 Edmunds Road                    )
Wellesley Hills, MA 02481          )
                                   )
and                                )
                                   )
JOHN LEONARD LOVERIDGE             )
Maison Du Pre                      )
Les Grand Marius, Vail             )
Guernsey GY3 Sdu,                  )
                                   )
                    Defendants.    )
                                   )

## INTRODUCTION

1.      Plaintiff Jonathan Glaubach, by and through his undersigned counsel, brings this action individually and on behalf of all persons and entities other than defendants, their affiliates, subsidiaries and family members who purchased or otherwise acquired Class B shares and/or restricted depositary shares ("RDSs") pursuant to the Offering Memorandum and supplement thereto of defendant Carlyle Capital Corporation Limited ("CCC") in its Initial Public Offering ("IPO") or in the open market thereafter and were damaged thereby. This action is brought pursuant to Section 90 of the United Kingdom's Financial Services and Markets Act 2000 ("FSMA 2000"), as amended, which governs the Offering Memorandum and the supplement thereto issued by CCC.

2.      The IPO raised $345 million from outside investors in addition to the $600 million that had already been raised in purely private placements. Within nine months of the IPO, CCC had completely failed and on March 17, 2008 was placed in liquidation proceedings. As a result, the entire $945 million of investors' money was eviscerated, including $345 million that was raised on a demonstrably false Prospectus. The June 2007 Offering Memorandum and communications to shareholders thereafter were riddled with false and misleading positive statements and omissions about CCC's financial condition and prospects that are the focus of this action. Unless they prove they were not negligent, the defendants are strictly liable for their conduct.

3.      Plaintiff's allegations herein are based upon personal knowledge as to himself and upon information and belief as to all other matters, and upon the investigation of his counsel, Robbins Geller Rudman & Dowd LLP and Abraham, Fruchter & Twersky, LLP, which has included a review of the publicly filed documents, including public filings of defendant CCC; research reports by securities and financial analysts; press releases; media reports; court filings; and information and evidence alleged in the Verified Complaint in *Carlyle Capital Corporation Limited (in Liquidation), et al. v. Conway, et al.*, Case No. 5625 (Del. Ch. Ct., filed July 7, 2010).

4.      Plaintiff's investigation into the factual allegations contained herein is continuing and further relevant facts related to the allegations herein are within the exclusive custody and control of CCC. Plaintiff believes that additional evidentiary support will exist for the allegations asserted herein after the parties are afforded a reasonable opportunity for discovery. The claims asserted herein do not sound in fraud, and any claims for fraud are specifically disclaimed.

**PARTIES**

5.      Plaintiff Jonathan Glaubach purchased CCC shares and was damaged thereby.

6.      Defendant CCC is a limited company formed and registered on August 29, 2006, under the Companies (Guernsey) Law 1994 (as amended). Until put into liquidation in Guernsey in March 2008, CCC operated from The Carlyle Group's (defined below) offices in New York and Washington D.C. CCC's shares were listed on the Euronext exchange in Amsterdam after its IPO was completed in July 2007. On March 17, 2008, CCC was ordered to be wound up by the Royal Court of Guernsey, with its Liquidators announcing days later that CCC's assets were insufficient to meet its liabilities. CCC remains in liquidation and is domiciled in Guernsey.

7.      Defendant Carlyle Investment Management, LLC ("CIM") is a Delaware limited liability company with its principal place of business in Washington, D.C. Pursuant to an investment management agreement with CCC, CIM was, at all relevant times, the investment manager of CCC.

8.      Defendant T.C. Group, LLC ("TCG") is a Delaware limited liability company with its principal place of business in Washington, D.C. TCG owns 75% of CIM.

9.      Defendant TCG Holdings, LLC ("TCG Holdings") is a Delaware limited liability company with its principal place of business in Washington, D.C. TCG Holdings is the managing member of TCG. Owing to its domination of TCG, CIM and CCC, it controlled at all relevant times the statements made in the name of CCC, including the statements made and omissions contained in CCC's Offering Memoranda.

10.    CIM, TCG and TCG Holdings do business as "The Carlyle Group" and are hereafter referred together as the "Carlyle Group" or "Carlyle."

11.    Defendant William Elias Conway, Jr. ("Conway") is a resident of Virginia and is or was a managing director of CIM, a director of CCC, and the Chief Investment Officer ("CIO") of TCG.

12.    Defendant John Crumpton Stomber ("Stomber") is a resident of Connecticut and is or was the Chief Executive Officer ("CEO"), CIO, President and a director of CCC, a managing director of CIM and a managing director of TCG.

13.    Defendant James H. Hance ("Hance") is a resident of North Carolina and at all relevant times was a director of CCC, Chairman of the Board and a senior advisor to CIM.

14.    Defendant Michael J. Zupon ("Zupon") is a resident of New York and at all relevant times was a director of CCC. Zupon was a founding member, CIO, managing director and head of Carlyle's U.S. Leveraged Finance Group.

15.    Defendants Conway, Hance, Stomber and Zupon were also members of an Investment Committee which was established for CCC and was chaired by Conway. The Investment Committee was constituted solely of the CCC directors who were also directors, officers and/or employees of TCG and/or CIM and/or other TCG entities.

16.    Defendant Robert Barclay Allardice, III ("Allardice") is a resident of New York and at all relevant times was a director of CCC.

17.    Defendant Harvey Jay Sarles ("Sarles") is a resident of Massachusetts and at all relevant times was a director of CCC.

18.    Defendant John Leonard Loveridge ("Loveridge") is a resident of Guernsey and at all relevant times was a director of CCC.

19.     CCC had no employees whatsoever and was controlled by Carlyle. CCC's management and investment committee consisted solely of Carlyle employees and advisors, including CCC's CEO, CIO and President, defendant Stomber. CCC's outstanding Class A shares, which were the only voting shares issued by CCC, were held at all relevant times by persons who were employed as managing directors of Carlyle and who thereby had the power to select the Board of Directors. CCC's Board of Directors was led and dominated by Carlyle employees and advisors.

20.     According to defendants, "We [CCC] do not directly employ any employees and we depend on Carlyle for the day-to-day management and operation of our business. Carlyle employs a team of investment professionals who are responsible for managing our affairs and structuring and monitoring our investment portfolio. This team is led by John C. Stomber, who also serves as our chief executive officer, chief investment officer and president. Additionally, we benefit from access to the resources and core competencies of other Carlyle employees who spend time on our operations. Finally, several executives from Carlyle are members of our board of directors and also serve on our Investment Committee."

21.     In circumstances where the issuer of the Prospectus is the captive instrument and alter ego of the sole voting shareholders – here the Carlyle Group – the voting shareholders both issue the Prospectus and are responsible for its contents.

22.     Defendants Stomber, Conway, Zupon, Hance, Allardice, Sarles and Loveridge (the "Individual Defendants"), each had the power and responsibility to control, and exercised such control and responsibility, over the Offering Memoranda and other documents and statements disseminated to the investing public in the name of CCC.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d)(2), because the amount in controversy exceeds

$5,000,000, the plaintiff is pursuing a class action, and at least one member of the class is a citizen of a state different from one of the defendants.

24.     Venue is proper in this district pursuant to 28 U.S.C. §1391(a), (b), and (c).  The Carlyle Group and CCC operated from this district at all relevant times with CIM, TCG and TCG Holdings also maintaining their principal place of business in Washington, D.C.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts and drafting of regulatory filings occurred in this district.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all persons and entities who purchased or otherwise acquired Class B shares and/or RDSs of CCC in its IPO and/or in the open market during the class period and were damaged thereby ("the Class").  Excluded from the Class are the defendants herein and their families, officers and directors of Carlyle and CCC, members of their immediate families and the heirs, successors or assigns of any of the foregoing.

26.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, more than 500 members of the Class.

27.     A substantial majority of CCC shares were, at all times, owned by U.S. residents. Thus, in addition to the fact that CCC was managed by Americans residing and conducting business in the United States, its shares were owned principally by investors in the United States.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Questions of law and fact common to the Class include:

(a)     whether the defendants engaged in acts or conduct in violation of Section 90 of the FSMA 2000;

(b)     whether the prices of CCC shares during the class period were artificially inflated because of the defendants' conduct complained of herein; and

(c)     whether defendants' misrepresentations and/or omissions of material facts caused the damages sustained by the plaintiff and the members of the Class and, if so, the appropriate measure.

29.     Plaintiff's claims are typical of those of the Class because plaintiff and the other members of the Class were similarly affected and sustained damages arising out of the defendants' wrongful conduct.

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained competent counsel highly experienced in class action securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

31.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all the members of the Class is impracticable. Furthermore, because the damages suffered by most of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**Carlyle and CCC's Business**

32.     The Carlyle Group began in 1987 and is today a global asset manager and investment adviser with 27 offices in 19 countries. It invests in private equity, real estate and credit alternatives in North America, Europe, Asia, the Middle East, Africa and South America. The Carlyle Group employs approximately 880 people, including more than 420 investment professionals. It currently operates 67 funds with more than $90 billion under management and is one of the world's largest private equity firms.

33.     CCC is a limited company incorporated in Guernsey, Channel Islands, on August 29, 2006. CCC was heavily promoted by the Carlyle Group before and following its incorporation. CCC shares were initially sold to investors through private placements, and later would become publicly traded as a result of a public offering commencing in June 2007. CCC's stated objective was to achieve superior annual profits and a dividend yield of at least 12% by investing in a purportedly diversified portfolio comprising residential mortgage backed securities ("RMBS") and leveraged financial assets, seeking to generate returns principally from the difference between the interest earned on the acquired assets and the cost of financing those assets through short-term repurchase agreements ("repos") and other forms of financing. CCC represented that it would conduct its business within strict Investment Guidelines ("Guidelines") in order to minimize risk and to provide a "safety-net" to protect CCC if there occurred excessive market volatility.

**Repurchase Agreements**

34.     RMBS leverage is frequently accomplished through use of repos. A fund first buys and then enters into a contract with a counterparty bank or prime broker, whereby ownership of the RMBS is transferred to the purchasing counterparty bank or prime broker. The fund, however, agrees to repurchase the RMBS at a specified time and price. A repo is akin to a secured loan in which the RMBS would serve as collateral for a loan to the fund. The only real difference is that the counterparty in a repo holds legal title to the securities during the term of the repo.

35.     Typically the amount of money received by the fund in such transactions would be less than the value of the securities. The difference is known as "the haircut." If the value of the RMBS declines or if the counterparty bank or prime broker demands a larger haircut, the fund has to commit more of its equity to make up the difference, requiring that the fund post additional collateral. With leverage of more that 30 to 1, the changes in the value of the securities or in the magnitude of the haircut do not have to be very large to cause a default.

36.     CCC established relationships with a number of financial institutions as repo counterparties. These included Bear Stearns & Co. Inc., Bank of America LLC, BNP Paribas Securities Corp., Calyon Securities (USA) Inc., Cantor Fitzgerald & Co., Citibank Global Markets Inc., Credit Suisse, Deutsche Bank Securities Inc., Goldman Sachs & Co., ING Financial Markets LLC, JP Morgan Securities Inc., Lehman Brothers Inc., Man Securities Inc., Merrill Lynch & Company Inc., Morgan Stanley and UBS Securities LLC.

37.     Upon the conclusion of a repo (which typically matures between 18 and 25 days), either party has complete discretion to enter into a new repo or extend, renew or "roll over" the existing repo. The discretion typically is absolute. As a result, CCC's repo counterparties were in a very strong negotiating position and generally able to dictate the terms upon which they would continue to provide repo financing to CCC, including the basis on which the fair value of the RMBS held as collateral was to be determined, and the amount of the haircut. Whenever a repo facility was being rolled over, the repo financier was at liberty to change the haircut required from CCC.

38.     Therefore, it was necessary for Carlyle, CIM and the directors of CCC to ensure that CCC had a sufficient number of counterparties to provide sufficient repo financing to it on terms acceptable to CCC. There was no guarantee that repo financing would remain available to CCC, or that repo financing would be available on terms and conditions acceptable to CCC. These risks to CCC were compounded by the very short duration of the repos entered into by it. They became

- 8 -

painfully evident in June and July 2007, when CCC experienced difficulties maintaining sufficient repo financing to enable it to continue to fund its RMBS assets.

**Margin Calls**

39.     CCC borrowed under repos based on the estimated fair value of its pledged RMBS. As such, CCC's counterparties could initiate margin calls in the event that market conditions changed or the value of its pledged RMBS declined.  The effect of a margin call was to require CCC to provide the repo counterparty with sufficient cash or securities to ensure that the repo counterparty held collateral of sufficient value to give the counterparty assurance that it could recover its loan should CCC default under the repo agreement.

40.     Accordingly, it was necessary for CCC's business model to prepare for the risk that CCC's repo counterparties would make margin calls.  The primary measure to address this risk was through the "Liquidity Cushion."

**Liquidity Cushion**

41.     CCC was required to maintain an unencumbered Liquidity Cushion in order to meet margin calls. CCC's Investment Guidelines required a Liquidity Cushion equal to no less than 20% of Adjusted Capital.  The Liquidity Cushion was intended to be sufficient to meet reasonably foreseeable margin calls on CCC's financed securities.  Defendants claim to have performed extensive statistical testing of CCC's expected portfolio, including testing during periods of significant financial market volatility and stress, to determine the level of the Liquidity Cushion, purportedly balancing the need for sufficient reserves with the desire to efficiently deploy capital. CCC's liquidity position was monitored by Carlyle and reviewed by defendants.

**Default**

42.     The events of default set out in CCC's repo agreements included CCC's failure to meet a margin call, becoming insolvent or otherwise communicating to its repo counterparty its inability to, or its intention not to, perform any of its obligations under the repo agreement.

43.     If an event of default occurred, CCC's repo counterparties were entitled, without further notice, to sell immediately any or all of the RMBS held as collateral or to give CCC credit for its RMBS held as collateral in an amount equal to the price obtained from a generally recognized source or the most recent closing bid quotation from such a source.

**The Formation and Initial Financing of CCC**

44.     CCC was the first Carlyle branded investment to "go public" and the Carlyle Group promoted CCC as a safe investment to be managed by the Carlyle Group, with the benefit of its special expertise, global resources and "conservative investment approach."

45.     At the first board meeting of CCC held in Washington, D.C. on October 6, 2006, defendant Stomber "explained that [CCC] is operating with a 38% liquidity cushion which was on the conservative end of the spectrum." Defendants Hance and Stomber reflected that "the most frequent questions received to-date in their fundraising activities related to the use of leverage," which the Individual Defendants were describing to potential investors as "conservative."

46.     The financing of CCC's investments in RMBS through repos utilizing extensive levels of leverage exposed CCC to various market risks and any increases in CCC's leverage would only magnify those risks, particularly in times of market volatility. CCC's business model had initially identified a high targeted leverage of 19 times capital, but by early 2007 targeted leverage had been increased by the defendants to 29 times capital. Actual leverage employed exceeded 30 times its capital.

47.     Implementing appropriate risk management measures was therefore of the utmost importance to the protection of CCC's capital and its ongoing viability. For these reasons, the defendants established Investment Guidelines for CCC that required certain critical ratios to be maintained to limit risk. These included the requirement to maintain a minimum Liquidity Cushion

(ratio of liquidity to equity) of 20% (initially 24%), a minimum level of borrowing capacity of 125% (initially 150%) and a limit of RMBS to 85% of CCC's total capital.

48.     The maintenance of minimum Liquidity Cushion was described by defendants, and recognized by defendants and by the market as "fundamental" to the management of a leveraged investment portfolio such as that of CCC.  The purpose of the minimum Liquidity Cushion was to protect CCC's capital by ensuring that cash, cash equivalents and unencumbered assets would be readily available to meet the requirements imposed by CCC's repo counterparties and other financiers.  The requirements included margin calls on its financed securities resulting from decreases in market value of financed assets and increases in collateral requirements – haircuts – being the percentage discount from the market value of the RMBS asset that lenders demanded when CCC sought to borrow against the RMBS asset.  Given the high level of leverage employed by CCC, prudent and conservative liquidity management was crucial to the viability of its business.  CCC had to be prepared for increases in effective borrowing costs in the event of a downturn in the markets, and to be able to readily access cash or cash equivalents to meet higher margin or security requirements.  Moreover, it was essential that CCC have available sufficient lines of credit.  Although defendants purportedly recognized this essential requirement, as detailed below, they failed to implement it and instead dissipated rather than increased CCC's liquidity as market conditions deteriorated.

49.     By December 31, 2006, CCC had acquired RMBS with a total fair value of $6,905,896,000, representing 94% of CCC's total assets.  CCC's Liquidity Cashion was $94,236,000 at December 31, 2006 (36.3% of Adjusted Capital) comprised of cash equivalents of $39,535,000 and unencumbered assets of $54,701,000.  CCC employed extreme leverage in purchasing its RMBS.  CCC had $6,745,918,000 in debt under repo agreements with six different repo counterparties, with a weighted average remaining maturity of 12 days.  The collateral of these

borrowings was comprised of securities with a fair value of $6,851,195,000. CCC's leverage as of December 31, 2006 was 25.6 times.

50.     The first round of external investment in CCC was completed by December 31, 2006, through a private placement of 13,154,000 shares at an issue price of $20 per Class B share, raising $263,080,000.

51.     In the first half of 2007, the global credit markets deteriorated significantly.  The increase in subprime mortgage defaults, first noted in February 2007, started impacting the market for RMBS and other assets owned by CCC.  The lax lending standards of the past, together with falling house prices, caused widespread defaults on mortgages, which in turn significantly reduced the value of RMBS and other financial assets.  As financial institutions' capital bases eroded, lending standards became stricter and margins tightened as lenders sought to minimize their risks and preserve their own liquidity.  Lenders started demanding more onerous terms from borrowers, insisting on significant additional margin and collateral requirements, including larger haircuts on repo financing.

52.     CCC issued 16,846,000 additional shares via a private placement on February 28, 2007, raising $336,920,000.

53.     The defendants had, since the formation of CCC, planned to conduct an IPO of CCC Class B shares, both for purposes of (1) raising additional capital to attempt to compete with other highly capitalized funds perceived by the defendants to be competitors, and (2) to support a public market for CCC shares that would enable the defendants to profit from the sale of CCC shares they received as incentive compensation.

54.     At the March 5, 2007 CCC Board meeting, the Board reviewed a draft of the Offering Memorandum prepared by defendants for the IPO that had been contemplated from the outset. Stomber told the Board that "the primary goal of the MD&A [Management Discussion & Analysis]

section was to inform a prospective shareholder that the overall investment strategy of [CCC] was to allocate capital and use leverage in a manner to maximize shareholder value and generate a steady dividend." For these reasons, Stomber explained that "the disclosure in the MD&A focused on the liquidity cushion, the diversification of the portfolio . . . and [CCC's] affiliation with Carlyle," all of which were consistent with the "relatively" "conservative" description of CCC made by the defendants. June 2007 was targeted for the launch of the IPO.

55.    Thereafter, defendants caused CCC to continue to borrow aggressively, and to acquire RMBS. By March 30, 2007, on an equity based of $600 million, CCC had already acquired $17.3 billion of financial assets (including $16.5 billion of RMBS amounting to 9% of CCC's assets). CCC's Liquidity Cushion was $159,445,000 at March 31, 2007 (28% of Adjusted Capital) comprised of cash and cash equivalents of $41,081,000 and unencumbered assets of $118,364,000. CCC continued to use extreme leverage in acquiring its RMBS to March 31, 2007.  CCC had $16,054,494,000 outstanding as borrowings under repo agreements with ten different repo counterparties, with a weighted average remaining maturity of 22 days.  The collateral for these borrowings was comprised of securities with a fair value of $16,385,477,000.  CCC's leverage as of March 31, 2007 was 26.6 times.

56.    Reflecting the turning tide, in April 2007, Stomber sought approval from the directors of CCC, on a supposed "one-time basis," to use the Liquidity Cushion to buy certain RMBS prior to the IPO, which entailed a reduction in the minimum Liquidation Cushion requirement to 15%. The Board approved his request.

57.    By May 2007, Carlyle and CIM had consumed the majority of the capital available to CCC for the purchase of RMBS and sought to obtain further capital to increase the size of CCC's investment portfolio and, with it, CCC's leverage.

58.     On May 10, 2007, CCC entered into a term loan agreement with CitiGroup Global

Markets Inc. (a corporate affiliate of the CitiGroup entity which marketed the IPO to investors),

which allowed CCC to borrow up to $191 million. The loan (the "Bridge Loan") was obtained in

contemplation of the IPO and was required to be repaid from the proceeds of the IPO. By May 30,

2007, Carlyle and CIM had already caused CCC to borrow the entire amount available under the

Bridge Loan and used the proceeds to finance the acquisition of additional RMBS in conjunction

with further repo financing.

59.     On June 7, 2007, Stomber sent an e-mail to the Board of CCC, informing the Board

of substantial losses that CCC had sustained as a result of recent market events. Stomber told the

Board that as a consequence of a change in the "5 years swap rate," a $25 million unrealized gain

had become an $8 million unrealized loss on CCC's mortgage-backed securities and that CCC's net

asset value had declined as a result. Stomber stated that "[t]oday was a wild day" in the market

"where rates went up materially" and that CCC could sustain further significant losses of up to $50

million. Stomber warned the Board that the level of CCC's unrealized losses raised disclosure issues

for the IPO. Most importantly, Stomher informed the Board that those events had negatively

impacted CCC's Liquidity Cushion:

> Bad news is the price change has eroded the liquidity cushion as we make margin
> calls based on spread changes. The Liq Cushion stands at 23 percent but could be
> called down close to 20 percent – that is why we have it.

60.     On June 13, 2007, Stomber sent a further e-mail to CCC's directors entitled "Status of

CCC." The e-mail was copied to various Carlyle officers. Stomber informed CCC's directors that

"[l]ast night we made the decision to postpone the IPO of CCC as a result of volatile market

conditions, an uncertain MTM [marked-to-market] of our balance sheet and comps in the equity

market trading down 10-25%." Stomber said that as of June 11, 2007, CCC's IFRS net income "was

on target for a 14.5% 2nd quarter" but he also noted that CCC's "Fair Value Reserve was down

$63.9MM from inception and $76.2MM for the year," meaning that CCC had suffered unrealized losses in those amounts under IFRS.[1]  Stomber then outlined CCC's "next steps for the immediate future," and stated:

> We are having a major liquidity event so I invoked "emergency powers" on the balance sheet.  The liquidity cushion is currently at $148MM, which is technically above 20% of our current MTM equity position.  But please take no comfort in that, we could be margin called for up to another $70MM and therefore bring the cushion down to about 11%.  Therefore, we need independent Board Member approval to go under 20% – that is the purpose of the liquidity cushion – to be there so we don [sic] not have to sell securities at depressed prices during a margin call.  Therefore, I ask you for your formal approval.

61.     Notwithstanding the additional risk to CCC's ability to survive, on June 14, 2007, the Board resolved to reduce CCC's minimum Liquidity Cushion requirement from 20% to no less than 10% of Adjusted Capital.

62.     During June 2007, CCC's portfolio suffered an unrealized loss of $52 million or 9.4% of CCC's net asset value.  When combined with the unrealized loss in May 2007 of 7% of net asset value, CCC suffered a 16% loss to net asset value.

63.     In the period from June through to August 2007, at a time when CCC's financial viability was already at risk, CIM, Carlyle and the directors of CCC did not increase or even maintain CCC's minimum 20% Liquidity Cushion.  This was despite the fact that the minimum 20%

---

[1]     CCC's financial statement and quarterly reports were prepared on the basis of International Financial Reporting Standards ("IFRS"), issued by the International Accounting Standards Board. IFRS permitted CCC to classify its RMBS as "available for sale" and gains or losses were accounted as "fair value reserve" unless the assets were sold or impaired.  IFRS are principles-based Standards, Interpretations, and the Framework (1989) adopted by the International Accounting Standards Board ("IASB").  Many of the standards forming part of IFRS are known by the older name of International Accounting Standards ("IAS"). IAS were issued between 1973 and 2001 by the Board of the International Accounting Standards Committee ("IASC").  On April 1, 2001, the new IASB took over from the IASC the responsibility for setting International Accounting Standards. During its first meeting, the new Board adopted existing IAS and Standing Interpretations Committee interpretations ("SICs").  The IASB has continued to develop standards calling the new standards IFRS.

Liquidity Cushion was not sufficient to meet margin calls attributable to the changes in the fair value of CCC's securities subject to repos as well as meeting increased "haircuts" from certain of CCC's repo counterparties.

64.     By the end of June 2007, in just nine months, CCC had acquired $21.8 billion of RMBS, representing 95% of CCC's total assets, financed by short-term borrowings under repo agreements of $21.2 billion.  CCC's leverage ratio as of June 30, 2007 was 40.2 times, or 29.8 times by treating the Bridge Loan of $191 million as equity.  Without the inclusion of the $191 million in proceeds of the Bridge Loan (which was required to be repaid to CCC's lenders), CCC's Liquidity Cushion was less than zero on June 30, 2007.  Including the proceeds of the Bridge Loan, CCC's Liquidity Cushion was $186,100,000 at June 30, 2007, comprised of cash and cash equivalents of $35,400,000 and unencumbered assets of $150,700,000.

65.     As of June 30, 2007, CCC's reported equity/net asset value was $552,629,000 and had fallen below the $600,000,000 in capital raised by way of private placement.

66.     On July 10, 2007, rating agencies downgraded numerous RMBS securities, leading to a significant market downturn.  The very next day, CCC completed the IPO and raised an additional $345 million in capital from plaintiff and the Class.

67.     As at July 31, 2007, CCC had a net asset value exceeding $945 million, all of which was subsequently lost.

**CCC's Misrepresentations and
Omissions in the Offering Memorandum**

68.     In June 2007, prior to completing the IPO, defendants were advised by CCC's underwriter banks that, because of market volatility, CCC's IPO should be delayed.  In response, defendants prepared various alternative "scripts" to use for communications with investors and journalists in the event that the IPO did not proceed.

69.     Nonetheless, on June 14, 2007, Stomber sent an email to CCC's directors, stating that, assuming all went well the following day, they intended to "file on Monday with the AFM [Netherlands' Authority for the Financial Markets] and proceed with the IPO."

70.     On or around June 19, 2007, defendants caused CCC to issue and begin to disseminate an "Offering Memorandum" of that date. At that time, the IPO was intended to consist of an offering by CCC of 18,874,420 newly issued Class B shares (in the United States in the form of RDSs) for listing and trading on the Euronext Amsterdam exchange, together with the sale by certain selling shareholders of 173,200 existing Class B shares. The Offering Memorandum stated that the initial offering price would be between $20 and $22 per Class B share.

71.     The Offering Memorandum presented a materially false depiction of CCC's financial condition, because, as described above, CCC's financial condition had deteriorated significantly in the three months between March 31, 2007 and the IPO, when plaintiff and other investors purchased Class B shares and RDSs

72.     The Offering Memorandum falsely represented that the fair value reserves[2] had fallen from $23.970 million as of March 31, 2007 to an estimated $(4.9) million (unaudited) as of June 13, 2007, just days before the June 19, 2007 date of the Offering Memorandum:

> As a result of changes in interest rates, we estimate that from April 1, 2007 to June 13, 2007, our fair value reserves declined by approximately $28.9 million (unaudited), from approximately $24.0 million (unaudited) as of March 31, 2007 to an estimated $(4.9) million (unaudited) as of June 13, 2007. This compares to an increase in our fair value reserves from January 1, 2007 to March 31, 2007 of approximately $11.6 million (unaudited). Although we did not close our financial records as of June 13, 2007, based upon our preliminary estimates, we do not believe that our total equity per Class B share as of June 13, 2007 was less than $20.25 (unaudited).

---

[2]     Fair value reserves are an important component of CCC's total equity and were reported in CCC's consolidated balance sheet as $12.325 million as of December 31, 2006 and $23.970 million as of March 31, 2007. *See* Offering Memorandum, dated June 19, 2007, F-3.

73.   Defendants' representations in the Offering Memorandum regarding the $(4.9) million fair value reserve and the estimated $20.25 total equity value per Class B share as of June 13, 2007 were false because those disclosures were contradicted by the e-mail dated June 13, 2007, entitled "Status of CCC" that defendant Stomber sent to CCC's Board of Directors, with copies to various CCC officers.   Stomber advised CCC's Board of Directors that "[l]ast night we made the decision to postpone the IPO of CCC as a result of volatile market conditions, an uncertain MTM [marked-to market valuation] of our balance sheet and comps [comparable securities] in the equity market trading down 10-25%."  Moreover, Stomber admitted that as of June 11, 2007, CCC's "Fair Value Reserve was down $63.9MM [million] from inception and $76.2MM for the year."  CCC's fair value reserve, in other words, fell $63.9 million from August 2006 to June 11, 2007 (*i.e.*, from CCC's inception to June 11, 2007 ), and fell $76.2 million from January 1, 2007 (or December 31, 2006) to June 11, 2007.  Accordingly, CCC's reported fair value reserve of $(4.9) million as of June 13, 2007 was overstated by $58.975 million or 92.3%.

74.   Defendants also materially overstated the estimated total equity per Class B share of $20.25 as of June 13, 2007, because the fair value reserve was a component of total equity, and the drop in the fair value reserve meant that CCC's estimated total equity and total equity per Class B share as of July 13, 2007 also materially declined.  As of March 31, 2007, CCC reported fair value reserves of $23.970 million, total equity of $621.627, and total equity per Class B share of $20.72.[3] Consequently, CCC's fair value reserves actually plunged by an estimated $87.845 million, from CCC's reported fair value reserves of $23.970 million as of March 31, 2007 to CCC's actual fair value reserves of $(63.875) million as of June 11, 2007, unbeknownst to potential investors.  As a

---

[3]   CCC Offering Memorandum, dated June 19, 2007, "Selected Financial Information," at 43.

result, CCC's total equity valuation and total equity per Class B share was also impaired because CCC's fair value reserves was a key component of its total equity.

75.     By overstating the reported fair value reserves by an estimated $58.975 million and the total equity per Class B share as of June 13, 2007, defendants failed to comply with certain IFRS requirements of IAS 10. IAS 10 "applies in accounting and information disclosure for events after the balance sheet date." IAS, ¶2. The latest balance sheet presented in the Offering Memorandum was dated March 31, 2007. IAS 10 states the following in pertinent parts:

- "In some cases, the entity needs to update the disclosures made in the financial statements to reflect information received after the balance sheet date, even if that information does not affect the amounts that the entity was recognized in the financial statements." IAS 10, ¶20.

- "When the events after the balance sheet date that do not involve adjustments are of such importance that failure to disclose may affect the ability of users of financial statements for the evaluations and take economic decisions, the entity shall disclose the following information, [f]or each of the major categories of events after the balance sheet date that do not involve adjustments: (a) the nature of the event and (b) an estimate of its financial [impact], or a statement about the impossibility of making such an estimate." IAS 10, ¶21.

- "The following are examples of events after the balance sheet date that do not involve adjustments, which usually occur [require] disclosures of information: . . . changes [that are] abnormally large, subsequent to the balance sheet date in asset prices . . . ." IAS 10, ¶22(g).

76.     By overstating the reported fair value reserves by an estimated $58.975 million and the total equity per Class B share as of June 13, 2007, defendants failed to comply with certain provisions of the IFRS Conceptual Framework for Financial Reporting, Chapter 1, the objective of general purpose financial reporting by failing to provide necessary financial information to potential investors:

OB2   The objective of general purpose financial reporting* is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders and other creditors in making decisions about providing resources to the entity. Those decisions involve buying, selling or holding equity and debt instruments, and providing or settling loans and other forms of credit.

- 19 -

* Throughout this *Conceptual Framework*, the terms *financial reports* and *financial reporting* refer to *general purpose financial reports* and *general purpose financial reporting* unless specifically indicated otherwise.

OB3  Decisions by existing and potential investors about buying, selling or holding equity and debt instruments depend on the returns that they expect from an investment in those instruments, for example dividends, principal and interest payments or market price increases.  Similarly, decisions by existing and potential lenders and other creditors about providing or settling loans and other forms of credit depend on the principal and interest payments or other returns that they expect. Investors', lenders' and other creditors' expectations about returns depend on their assessment of the amount, timing and uncertainty of (the prospects for) future net cash inflows to the entity.  Consequently, existing and potential investors, lenders and other creditors need information to help them assess the prospects for future net cash inflows to an entity.

OB4  To assess an entity's prospects for future net cash inflows, existing and potential investors, lenders and other creditors need information about the resources of the entity, claims against the entity, and how efficiently and effectively the entity's management and governing board† have discharged their responsibilities to use the entity's resources.  Examples of such responsibilities include protecting the entity's resources from unfavourable effects of economic factors such as price and technological changes and ensuring that the entity complies with applicable laws, regulations and contractual provisions.  Information about management's discharge of its responsibilities is also useful for decisions by existing investors, lenders and other creditors who have the right to vote on or otherwise influence management's actions.

† Throughout this *Conceptual Framework*, the term *management* refers to *management and the governing board of an entity* unless specifically indicated otherwise.

\*     \*     \*

OB12  General purpose financial reports provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity.  Financial reports also provide information about the effects of transactions and other events that change a reporting entity's economic resources and claims. Both types of information provide useful input for decisions about providing resources to an entity.

77.    In CCC's Offering Memorandum, in the "Leverage and Liquidity" section, defendants also falsely stated that "[w]e are required to hold a Liquidity Cushion consisting of unrestricted cash and cash equivalents and unencumbered U.S. agency or U.S. government securities equal to no less than 20% of our Adjusted Capital." In fact, throughout the Offering Memorandum,

- 20 -

defendants repeatedly and falsely disclosed that their investment guidelines "require a Liquidity Cushion equal to no less than 20% of our Adjusted Capital." The Offering Memorandum represented:

> Our investment guidelines require us to hold unrestricted cash and cash equivalents and unencumbered U.S. agency or U.S. government securities (together, the "Liquidity Cushion") equal to no less than 20% of our Adjusted Capital. The Liquidity Cushion is intended to be sufficient to meet reasonably foreseeable margin calls on our financed securities.

*     *     *

> The maintenance of an unencumbered Liquidity Cushion is fundamental to the management of a leveraged investment portfolio. Our current investment guidelines require a Liquidity Cushion equal to no less than 20% of our Adjusted Capital. The Liquidity Cushion is intended to be sufficient to meet reasonably foreseeable margin calls on our financed securities. We have performed extensive statistical testing of our expected portfolio, including testing during periods of significant financial market volatility and stress, to determine the level of this Liquidity Cushion, balancing the need for sufficient reserves with the desire to efficiently deploy capital. Our liquidity position is monitored by Carlyle and reviewed by our board of directors.

78.     These disclosures were false because on June 14, 2007, just days before the June 19, 2007 Offering Memorandum date, CCC's Board of Directors agreed to reduce CCC's minimum Liquidity Cushion from 20% to only 10% of adjusted capital. Consequently, defendants failed to comply with financial reporting provisions OB3, OB4, OB8, and OB12 of the IFRS Conceptual Framework for Financial Reporting, Chapter 1, the objective of general purpose financial reporting, referred to in ¶76.

79.     The Offering Memorandum also contained a description of certain of CCC's "Recent Developments." Defendants represented that CCC's fair value reserves had declined by only $17.3 million between January 1, 2007 and June 13, 2007 (an increase of $11.6 million from January 1 to March 31, 2007, and a decline of $28.9 million from March 31, 2007 through June 13, 2007). This statement was false and misleading. As noted above, defendant Stomber had told all Board

members, on June 13, 2007, that the "Fair Value Reserve was down $63.9MM from inception and $76.2MM for the year."

80.     In the Offering Memorandum, defendants also represented that the decline in fair value reserves between March and June 2007 was the "result of changes in interest rates." That statement was false and misleading.  The decline was due in large part to a dramatic increase in the haircuts charged by CCC's repo lenders, which threatened the viability of CCC's business model.  In June 2007 alone, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Man Securities Inc. and Bear Stearns & Co., Inc. all demanded haircuts of 3% to roll existing repos with CCC.

81.     In the Offering Memorandum, defendants further represented that they were "targeting the payment of a dividend within a range of approximately $0.51 to $0.56 per Class B share (unaudited) for the quarter ending September 30, 2007 and within a range of approximately $0.53 to $0.58 per Class B share (unaudited) for the quarter ending December 31, 2007," and that "[w]e do not believe that these changes in interest rates or the fluctuations in our fair value reserves and total equity per Class B share will affect our targeted dividends for the quarters ending September 30, 2007 and December 31, 2007." These statements were false and misleading in that the calamitous declines in CCC's fair value reserves and massive impairment of its liquidity that had occurred to date, and would likely occur in the near future, would render the issuance of dividends in the third and fourth quarters of 2007 unrealistic.

82.     In the Offering Memorandum, defendants touted the relationship between CCC and Carlyle, Carlyle's status as "one of the world's largest private investment firms" that "combines global vision with local insight," and has in its employ "a team of 782 employees, including 416 investment professionals operating out of 29 offices in 18 countries." The defendants further represented that "[w]e have structured our relationship with Carlyle to ensure that our interests are closely aligned." The foregoing statements were false and misleading.  They falsely portrayed CCC

as an investment product typical of Carlyle ventures when the Carlyle brand name was more closely associated with unusual investment opportunities offered to elite investors. CCC, on the other hand, supposedly was a conservative fund, with a not unusual business model. Accordingly, Carlyle's resources would not provide CCC with any particular advantages. Moreover, the interests of Carlyle and CCC were not "closely aligned," as CIM and Carlyle had an interest in maximizing management fees and benefits paid by CCC (over $40 million in total), and in prolonging the operations of CCC in order to do so. It would have been in the interests of CCC to cease operations entirely, or at least to scale back its purchases of RMBS, in order to minimize losses.

**The IPO**

83.    On June 28, 2007, CCC announced that it had postponed the pricing date for the IPO and that it would issue a supplemental Offering Memorandum containing a revised timetable for the global offering, as well as changes to the terms of the offering. On the same day, Stomber issued a letter to investors on behalf of CCC, stating that CCC was reducing the size of its offering to $300 million (from $415 million) at a price of $19 per share (from $22 per share).

84.    On June 29, 2007, defendants caused CCC to issue a Supplemental Offering Memorandum, announcing a decrease in the number of Class B shares being offered from 19,047,620 to 15,962,673 and that the initial global offering price would be $19 per Class B share.

85.    On July 4, 2007, CCC Class B shares were listed on the Euronext exchange. The IPO was completed on July 11, 2007, with sales of a further 18,183,873 Class B shares issued at $19 per share, raising gross proceeds of $345,494,000. On the same day, defendants arranged for the $191 million Bridge Loan to Citigroup to be repaid using the funds raised through the IPO, together with $1,798,000 in interest on the two-month loan. The total funds therefore raised by CCC through the private placements in December 2006 and February 2007 and the IPO in July 2007 exceeded $945 million.

**Defendants Continued to Misrepresent
CCC's Condition and Prospects After the IPO**

86.     At the time of the IPO and thereafter, defendants continued to misrepresent that they were following CCC's Investment Guidelines.  In a July 26, 2007 letter to shareholders, Stomber represented as follows:

> We are proud to say that the model worked as we planned during the recent interest rate rise and we maintained our liquidity cushion in accordance with our investment guidelines. . . .
>
> We will likely reduce our use of leverage and focus on maintaining targeted performance rather than increase returns.  Higher credit spreads and increased volatility in the financial markets increases the risks of our portfolio.  By reducing leverage, we believe we can offset the increase in risk associated with higher spreads and volatility while maintaining targeted returns.

87.     The foregoing statements were false and misleading.  CCC's model had not "worked."  Market conditions had deteriorated drastically since late 2006.  As measured by the market value of its assets, CCC had lost approximately $70 million since its inception.  Nor had it effectively maintained the liquidity cushion the defendants claimed would exist.  The Board of CCC had twice granted exceptions to maintaining that cushion, a fact not disclosed to the public in the Offering Memorandum, in the Supplemental Offering Memorandum or otherwise.  Additionally, the proceeds of the Bridge Loan were the only reason that CCC did not have a negative liquidity cushion at the time of the IPO.

88.     At a July 26, 2007 Board meeting, the defendants caused the Board to approve the acquisition of a further (approximately) $1.5 billion in RMBS.  On July 30, 2007 and August 3, 2007, the defendants caused CCC to purchase $1,429,089,180 and $73,550,172 of RMBS respectively, thereby continuing to deplete CCC's remaining liquidity at a time when it needed instead to be increased.  Certain of CCC's repo counterparties were requesting haircuts in the range of 3% to 5% during July 2007 for RMBS repos with CCC.  In particular, Bank of America LLC indicated to CCC that it was considering obtaining higher haircuts from CCC.

89.     By August 2007, CCC had little or no Liquidity Cushion available to it and drastically needed to reduce leverage and restructure its business model. However, CCC did not sell any RMBS. In August 2007, CCC had more than $21 billion of outstanding repo borrowings, employing leverage of 32 times capital.

90.     During August 2007, the repo financing relationship between Cantor Fitzgerald (which had previously provided $3 billion of repo financing) and CCC ceased following a $73 million margin call, which Carlyle and CIM refused to meet. Bank of America and JP Morgan refused to provide repo funding to CCC despite previously having open repo line availability of over $5 billion. Other repo counterparties such as Lehman Brothers, Bear Steams, UBS and Deutsche Bank continued to seek and require haircuts of 3% to 4%.

91.     On August 7, 2007, Stomber informed Conway and Hance that "FT [pricing] marked us down 30MM today" and that "Cantor made a margin call that we would not accept and we moved the RMBS." Stomber also said that he suspected "we may go below 20 percent on our liquidity cushion and will ask the independent directors for prior approval tonight or tomorrow to do so. Will ask at the next Board meeting for unilateral approval to go to 15 percent for 90 days so we get away from fire drills." Stomber concluded his e-mail by stating:

> I do not see this problem getting better in the short run – I expect it to get worse. As a public company, we need to stick to our mandate of being a safe investment and not chase the last 50-100 bps of dividend yield. Our dividend as it is remains superior to the competition.

92.     On August 17, 2007, Stomber sent the following e-mail from his Blackberry, entitled "Update for the Week," to CCC's directors, which described the grave predicament that had befallen CCC:

> Joanne said I should give the Board an update for the week – I have spoken to you or you have received emails so I will quickly cover earlier events and focus on where we are currently at –

93.     The current credit market meltdown is worse than 98 on a stat basis – pure fact

94.    The liquidity cushion was designed to cover a 98 meltdown and then some. In 98, no repo dealer questioned a 2 percent haircut on floaters and prices were transparent

95.    The subprime meltdown and the word mortgage has affected even the price of AAA US govt floating rate cap securities because of lack of buyers beyond what model prices suggest – not hiding behind a model, simply put for the first time in my career plain vanilla agency debt traded from a historic price of Libor minus 16 to Libor minus 11 – now back at minus 16. We buy plain vanilla securities overlaid with a cap that is very transparent in the market. This is not about exotic option model where it is difficult in price. The price of 5 year caps (a benchmark for our portfolio) is plain vanilla and quoted on Bloomberg.

96.    Repo dealers have abandoned our FT third party pricing service and are marking securities to distressed prices. We have over 100MM of cash posted to repo dealers as margin over the MTM of the portfolio.

97.    We have LH asking for 70MM of margin in the past 4 days and agreeing they have changed their MTM on repo to be more conservative and at levels to sell securities in size. They readily admitted today that prices in the market for 50MM blocks were significantly below their mark.

98.    Our most pressing risk is to dealers suddenly saying all haircuts are at 3 percent – a 50 percent increase in margin or 1 percent on 23 bil of securities is 230MM.

Facing this risk, I asked Carlyle to put in an additional 100MM of cash in unsecured note form after our 6 underwriting banks agree that –

99.    They will maintain a 2 percent haircut going forward

100.    They will honor their amount of line committed on a reasonable basis

Bill C and I are meeting with the 6 IBs Monday to present our proposal. Early indications are the IBs want to work with us and solve the problem. After all, they just affirmed their DD on us and took us public – they should not be the very same banks that are not living up to agreements, especially on pricing of repos.

The paradox – the market meltdown means the Fed can not raise rates – so our capped securities will not be at risk for rates, going above the cap. Our FT pricing service showed a gain of 13MM last night. Our IFRS income and dividend target is on target. Meanwhile we were margin called today to the extent where we have about 5MM of cash left – Lehman was the worse example of a repo dealer where repo marks were 20 to 50 bps away from where new securities were being offered in the cash market. JPM went to a 3 percent haircut and we moved securities to Citi at 2 percent – Citi has been a total pro. On the other hand, JPM made the comment a couple of days ago that all counterparties are at 3 percent haircut – which implies all counterparties are the same and the securities they buy are the same. So much for sophisticated risk/credit models that new BIS standards must approve.

Our plan that you approved is to – meet with the 6 underwriters Monday and tell them they must honor 2 percent haircuts and reasonable prices and if so, Carlyle will put 100MM of cash into CCC in unsecured note form.

Now is not the time to tell you how we expect to finance repo in the future to remove this problem. It deals with a term repo market, guaranteed repo lines and not having securities bought on a ramped basis so we have concentrated risk to one general price level of RMBS securities. This all will be vetted at a future Board meeting.

Bill has asked if I can . . . still digest solid foods? – wish that was my problem, but not an issue. I will likely have to listen to my taped speeches of Churchill during WWII for inspiration.

Available all weekend for any question from anyone addressed.

101.   During an August 23, 2007 emergency meeting of the Board, Hance explained to the

Board that:

(a)    in the last four weeks since the last Board meeting, the mortgage markets in

the United States had gotten "decidedly worse";

(b)    CCC had faced substantial margin calls;

(c)    some of CCC's lenders had decreased the amount they were willing to lend

CCC to 97% of the value of the underlying securities (that is, they increased the haircut to 3%);

(d)    CCC had gone through $200 million of liquidity; and

(e)    it was likely that CCC would draw down the full $100 million of the Carlyle

loan.

102.   According to Hance: "The overall effect of these events on [CCC] has been to diminish [CCC's] liquidity cushion below zero." As a result, CCC would need more cash if it was to be able "to make the repurchase roll on Monday," August 27, 2007. "[M]anagement is under no illusions of the impact of recent events on the portfolio and realizes that it needs to preserve capital where it can. Management believes it would be prudent to wind down the Company to its core level at this time."

103.   Between August 17, 2007 and September 17, 2007, CCC's capital allocated to RMBS exceeded 85% as a consequence of sales of CCC's assets other than RMBS assets. CCC's capital allocated to RMBS exceeded 85% at all times thereafter.

104.   If defendants had accurately recognized CCC's actual losses, they would have exceeded $270 million as of August 31, 2007.

105.   On August 27, 2007, Stomber issued a letter to CCC's shareholders in response to several of its shareholders' requests "for information about the current status of CCC's investment portfolio." The letter described the effects of recent market volatility upon CCC:

> This environment produced two adverse consequences for CCC: (i) a modest decline in the fair value of AAA rated US Government agency issued mortgage-backed securities, and (ii) an increase in collateral (margin) required by our lenders. As the fair value of our MBS portfolio declined, our lenders made margin calls to ensure that the amount of CCC's indebtedness did not exceed the fair value of the underlying collateral. In addition, some of our lenders have recently decreased the amount they were willing to lend CCC to 97% of the fair value of the underlying securities, from the historical lending rate of 98% of fair value. Consequently, CCC's liquidity cushion has not been sufficient to meet recent margin calls. Management and the board have acted swiftly and definitively to address the dramatic change in our business environment.

106.   The foregoing statement that management had acted "swiftly and definitively" to address the challenges facing CCC was false and misleading. The defendants took no meaningful steps to address CCC's liquidity problems. The defendants failed and refused to sell any RMBS because it would have forced CCC to recognize its (thus far) unrealized losses, and reduced the

prospect of issuing a quarterly dividend. The measures taken by the defendants instead were attempts to put in place short-term solutions to avoid the sale by CCC of RMBS assets.

107. In the month of August 2007, CCC's reported net asset value had declined by approximately 24% from $843,483,058 at the end of July 2007 to $642,104,242 at the end of August 2007, a loss of some $200 million in one month.

108. Defendants announced on September 11, 2007, that fundamental revisions to CCC's business model were required and would be implemented, acknowledging that CCC's business model needed to be thoroughly restructured to reduce leverage and increase the minimum Liquidity Cushion to at least 40%. By then, however, CCC's excessively leveraged condition had already made it vulnerable to imminent collapse.

109. The defendants' announcements of September 11, 2007, were false and misleading. They did not employ any material revisions to CCC's business model. They did not, in practice, impose nor could they impose a 40% minimum liquidity requirement, nor did they substantially reduce CCC's overall leverage. Defendants continued to operate CCC well outside the limits set in its Investment Guidelines. In fact, internally they expressly approved the suspension of the requirements (a) of a 20% minimum Liquidity Cushion, (b) that CCC maintain repo lines of a minimum of 125% of all borrowings, and (c) that a maximum of 85% of CCC's capital be allocated to RMBS.

110. On October 1, 2007, Stomber sent an e-mail to CCC's directors, copied to several Carlyle officers, which requested approval for the suspension of the requirements (a) of a 20% minimum Liquidity Cushion, (b) that CCC maintain repo lines of a minimum of 125% of all borrowings, and (c) that a maximum of 85% of CCC's capital be allocated to RMBS. The Board approved the requests.

111. In CCC's report for the quarter ending September 30, 2007, issued on or about November 15, 2007, Stomber represented that CCC's "20% liquidity cushion was adequate for the price changes on our AAA-rated Agency portfolio during this quarter."

112. By November 13, 2007, CCC's Liquidity Cushion had been further reduced to $19.9 million, which was 3% of Adjusted Capital. Contrary to their representations to the investing public, defendants had not taken the steps necessary to maintain, let alone increase, CCC's Liquidity Cushion.

113. On November 13, 2007, the Board met. The Board approved CIM's quarterly management fees (for the quarter ending September 30, 2007) of $3.9 million. The Board approved the repayment of an outstanding $100 million loan from Carlyle, and the borrowing of an additional $100 million (at 10% interest) from Carlyle. Defendants also amended the definition of "Liquidity Cushion" to include as liquid assets undrawn debt from Carlyle. Thus, instead of taking steps to actually improve CCC's liquidity position, defendants re-engineered the definition of "liquidity," making CCC's position appear more favorable than it was. The Board did not take any steps to actually address CCC's precarious liquidity problems and over accumulation of RMBS-based assets. At the same Board meeting, Hance informed the Board "that management was recommending several changes to [CCC's] investment guidelines based on its experiences during recent weeks" and Stomber stated that management recommended the suspension of certain requirements of CCC's Guidelines until March 31, 2008, "to give management increased flexibility to manage CCC through the liquidity crisis." Despite not having available sufficient cash to do so, Stomber and other members of the Board advocated at the November 13, 2007 Board meeting that CCC should still plan to pay a dividend based on fourth quarter and year-end earnings.

114.    At the meeting of the Board of CCC on November 13, 2007, as proposed by Carlyle and CIM, the directors of CCC resolved to suspend until March 31, 2008, the requirement that CCC maintain a minimum Liquidity Cushion.

115.    Defendants took no steps to (a) reduce RMBS assets; or (b) acquire assets with lower risk, such as AAA rated G7 government securities with a maturity of less than three years, in order to restore CCC's capital allocated to RMBS to at most 85%.  CCC's capital allocated to RMBS as calculated by CIM increased to 94% by September 30, 2007, and continued to increase to 98% by December 31, 2007 and to 99.8% by January 15, 2007.

**The Collapse of CCC**

116.    At a meeting of the Board of CCC on February 27, 2008, as proposed by defendants, the directors of CCC resolved to suspend CCC's minimum 20% Liquidity Cushion requirement until September 30, 2008.

117.    On February 27, 2008, CCC issued its annual report for the year ending December 31, 2007.  CCC reported net income of $16,790,000, under IFRS, for the year ended December 31, 2007.  Stomber falsely represented that "[d]uring the fourth quarter our portfolio stabilized and we were able to generate returns consistent with our near term targets."  Stomber further represented that "[w]e continue to run our business to preserve the value of our shareholders' equity."

118.    These statements were false and misleading, as CCC was in perilous financial condition and on the verge of collapse.  As of December 31, 2007, CCC had incurred a change in the fair value reserve deficit of $285,623,000 under IFRS guidelines.  Under U.S. GAAP, CCC would have reported a loss of $266,987,000, CCC's Liquidity Cushion, as originally defined, was $27,181,000 as of December 31, 2007 (4.1% of Adjusted Capital), comprised of cash and cash equivalents of $11,751,000 and unencumbered RMBS of $15,430,000.  According to the definition as amended on November 13, 2007, CCC's Liquidity Cushion was $67,181,000 (10% of Adjusted

Capital), comprised of cash and cash equivalents of $11,751,000, unencumbered RMBS of $15,430,000 and undrawn loan funds from Carlyle of $40,000,000.

119.   On March 5, 2008, CCC issued a press release, indicating that, during the week between February 28 and March 5, it had received margin calls from lenders requiring it to post an additional $60 million of collateral.   CCC could not meet all of those demands, which led at least one lender to send a default notice.   On Thursday, March 6, CCC shares were down 60% (from approximately $15 per share) to $5 per share.   The Dutch market regulator suspended trading in CCC after its shares closed on Thursday, March 6, 2008, at a price of approximately $5 per share.

120.   On Tuesday March 11, 2008, trading in CCC shares re-opened.   On March 12, 2008, CCC announced that "it expects lenders will promptly take possession of substantially all the Company's remaining assets" after it was unable to meet surging margin calls on its portfolio of residential-mortgage-backed securities.   Shares of CCC lost 95% of their value, falling from approximately $3 per share to $0.15 per share.

121.   On March 17, 2008, the Royal Court of Guernsey entered a "winding up" order directing that CCC be liquidated, and appointed certain liquidators to wind down the affairs of, and liquidate, the enterprise.   Alan Roberts and Neil Mather were appointed Joint Liquidators of CCC. On March 18, 2008, Christopher Morris and Adrian John Denis Rabet were appointed Additional Joint Liquidators.   As a result, the value of the CCC securities purchased or otherwise acquired by plaintiff and the Class was reduced to zero.

### STATUTE OF LIMITATIONS

122.   Claims brought pursuant to Section 90 of the United Kingdom's FSMA 2000 must be brought within 6 years of discovering that an investor had a claim.

123.     Here, the first date that investors knew they had a claim was less than six years prior to filing this complaint, and thus this claim has been asserted within the applicable limitations period.

## COUNT

### Section 90 of the United Kingdom's FSMA 2000

124.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

125.     This Count is brought pursuant to Section 90 of the FSMA 2000, as amended by Statutory Instrument 2005 No. 1433 (the "Prospectus Regulations 2005") against defendants, seeking damages in relation to plaintiff's and other Class members' purchases and/or acquisitions of CCC shares, including purchases in the offerings and in the secondary market.

126.     Shares were issued pursuant to an Offering Memorandum and supplement thereto which were issued by CCC to plaintiff and other members of the proposed Class.

127.     The Offering Memorandum and supplement thereto are governed by English law.

128.     Defendants made misrepresentations in the Offering Memorandum and thereafter as alleged herein, and omitted matters that were required to be included.

129.     Section 90 of the FSMA 2000, as amended by Section 6 of the Prospectus Regulations 2005, provides for compensation to investors who purchase securities to which a prospectus or supplementary prospectus applies, and who suffer damages as a result of any untrue or misleading statement in the prospectus or supplementary prospectus, or an omission of information required to be included by the FSMA 2000.

130.     Consent by the Bailiwick of Guernsey in the United Kingdom was obtained for the issuance of the Offering Memorandum.

131.     Plaintiff and other members of the proposed Class purchased and/or otherwise acquired CCC shares to which the Offering Memorandum and supplement apply.

132.   Plaintiff and other members of the proposed Class suffered damages as the direct and proximate result of the misrepresentations and omissions.

133.   Defendants are responsible for the contents of the Offering Memorandum and supplement, and are strictly liable for the misrepresentations contained or incorporated therein and for omitting matters that were required to be included.

134.   By reason of the foregoing, defendants are liable to plaintiff and other members of the proposed Class for compensation as provided by Section 90 of the FSMA 2000, as amended.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff on behalf of the Class prays for relief and judgment including:

A.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of the misrepresentations described herein, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.   Awarding plaintiff and the Class their costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands trial by a jury on all of the triable issues of this complaint.

DATED:  August 22, 2011

THE LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (D.C. Bar No. 056358)

_____
ROGER M. ADELMAN

- 34 -

1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)
radelman@erols.com

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARK SOLOMON
BRIAN O. O'MARA (D.C. Bar No. 996144)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
S. ASHAR AHMED
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ABRAHAM, FRUCHTER & TWERSKY, LLP
JACK G. FRUCHTER
One Pennsylvania Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655 (fax)

Attorneys for Plaintiff

S:\CptDraft\Other\Carlyle Cpt.doc

## CERTIFICATION OF JONATAHAN GLAUBACH
## IN SUPPORT OF CLASS ACTION COMPLAINT

Jonathan Glaubach ("plaintiff") declares, as to the claims asserted, that:

1.  Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  During the proposed Class Period, plaintiff purchased 500 shares of Carlyle Capital Corporation Limited in its Initial Public Offering at a price of $19.00 per share.

5.  In the past three years, plaintiff has not served nor sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6.  Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of August, 2011.

Jonathan Glaubach